The first case today is Samaila v. Attorney General. Am I pronouncing that name right? We think we have agreement. Sumaila. Sumaila. Sumaila. That's good. It's good when we start with an agreement. Let's hope it stays that way. Mr. Kane? Your Honor, I'm Adrian Rowe and I just wanted to introduce the people who are with me today. Leslie Yost and I are instructors in the clinical law program at the Immigration Law Clinic at West Virginia University School of Law. And we have here today two third year students from WVU, Paige Betto and Scott King. And the court I believe has granted a motion for them to be admitted specially. Correct. And Ms. Betto will present the first part of the argument concerning past persecution. And I believe Mr. King will present the second part of the argument which will address future persecution as well. And with that I turn it over to the students. Thank you very much for doing this. Thank you, Your Honor. Ms. Betto? Good morning, Your Honors. May it please the court, my name is Paige Betto. I'm a clinical law student with the West Virginia University Immigration Law Clinic. The clinic represents the appellant in this matter, Adamu Sumaila. I'd like to reserve two minutes for rebuttal if I may. Very well. Thank you. In January of 2016, at approximately 4 in the morning, Mr. Sumaila was in his bedroom with his partner when his father burst in unannounced and discovered that his son was in a homosexual relationship. Mr. Sumaila's father began to shout that his son had betrayed the family and that he would face the wrath for his evil deed. The shouting of the father drew the attention of members of the community who then crowded into Mr. Sumaila's bedroom in the form of a mob. They brought with them weapons like sticks, iron rods, and a cutlass. They began to beat Mr. Sumaila and his partner while they were still naked on the bed. They dragged them from the bedroom to the courtyard where the mob then began to argue over how best to execute Mr. Sumaila and his partner, either by beheading or by fire. Mr. Sumaila then ran for his life to the shelter of a friend's home where he remained for two days. So is it your position that that encounter, that beating, constitutes past persecution? Yes, Your Honor. We argue that the January 2016 incident, that beating, rises to the level of past persecution under the standards set forth by this Court in the case of Chavarria v. Gonzales because he endured a threat to his life that was imminent, menacing, and concrete, and he suffered harm from that threat. What do you make of the immigration judge's findings that there were no medical issues or no medical treatment required? Your Honor, the standard set forth in Chavarria v. Gonzales does not require medical treatment or evidence that the applicant needed medical treatment. Rather, the standard states that the applicant suffered a threat to their life that was imminent, menacing, and concrete. As we have here, Mr. Sumaila was directly threatened by this mob. They argued in front of him how they planned on executing him, not whether they should execute him. They then took steps toward that execution by pouring kerosene over him and by bringing a weapon like a cutlass, which would be capable of beheading a person, and he suffered harm from this incident. He did sustain injuries to his head, back, and face. He testified to that as well as his family members testified that he did sustain injuries. He has been outed as a homosexual in his community, and he endured that threat to his life. All right. Now, in your brief, you've argued in your brief. Go ahead. Go ahead, Judge Roth. This information came out for the first time that he was homosexual. Is that an indication that there will be continuing attacks of this type until the attackers feel they have succeeded in killing him, or is this more like just one incident of a tremendous attack? Your Honor, there are at least five pieces of evidence in the record that indicate that there is a pervasive homophobic attitude in the country of Ghana that the government is unwilling and unable to control. Mr. Smila himself testified that he feared returning because his father is still looking for him and intends to behead him if he finds him. His friend testified that the government does not care for the rights of homosexuals and that politicians often make promises to eradicate homosexuals from the country. The country report and the Amnesty International report both state that homosexuals cannot report these instances of violence that happen against them to the police force because the police force will then harass them, blackmail them, be violent toward those homosexuals who report any instances of violence. So, yes, this is an ongoing threat to his life, especially now that he has been outed as a homosexual. What did you make of that? It's not just a one-time incident. Not just a one-time incident. No, I don't think this is a one-time incident. I think his life would continue to be in danger if he was returned to the country. Let me focus on that question for a second. Are these working? Is this one working? Probably not. Anyway. If you'd like to share this one. I switched seats and didn't take the microphone. In your brief, I believe you also argued that both the IJ and the BIA misstated the law. Yes, sir. That there had to be more than a single incident. Is that accurate? Is that your position on the law? Yes, Your Honor. We think that the IJ in his determination and the BIA when they affirmed that determination misstated the law. They relied largely on Cabinda, the Attorney General, and Chen V. Ashcroft to determine that a single incident that does not result in serious harm does not rise to the level of past persecution. However, that is not the standard that was set forth in Chavarria. In this case, it's different from either of those cases because in Cabinda and in Chen, those applicants did not allege that they had endured a threat to their life, much less a threat that is imminent, menacing, and concrete as we have here. All right. What relief are you asking for here? What is it that we should do if we agree with you? We ask the Court to reverse the decision below and grant Mr. Sinaloa's petition for asylum withholding of removal or cap. Are we able to do that based on the state of the record? Yes, Your Honor. What if we concluded that the wrong law was applied and that this matter should be remanded? Yesterday, we got a letter from the government involving the Matter of A.B. case. This case was sent back with the Matter of A.B. then applied to this case. I don't think the Matter of A.B. necessarily changes the conclusion that the Court should reach because we have demonstrated that the government is unable and unwilling to control the persecution that private actors, the violence that private actors are perpetrating on homosexual individuals, if that answers your question. The I.J. also misstated some facts that Mr. Sinaloa put forth. The I.J. stated that Mr. Sinaloa did not need medical treatment. However, Mr. Sinaloa never testified that he didn't need medical treatment. Rather, when he was questioned as to whether or not he sought medical treatment, he said that he was too afraid to leave the shelter of his friend's home. He was afraid to go to the hospital and expose himself to further persecution. Your Honor, I see that I'm almost out of time, and I'd like to turn to my colleague, Scott Cain, who will be arguing the final point we would like the Court to address. Sure, thanks. Thank you. Good morning, Mr. Cain. Good morning, Your Honor. May it please the Court, my name is Scott Cain, and my colleague, Ms. Betto, has already spoken to you about the past persecution Mr. Sinaloa has faced. I will be addressing the future persecution that Mr. Sinaloa will likely face if forced to return to Ghana. There are two parts of future persecution, the subjective genuine fear and the objective reasonable possibility of persecution. The immigration judge has already ruled that Mr. Sinaloa has met the burden of subjective fear. So that just leaves us today with the objective fear that he is likely to face future persecution. What do you make of the language in the immigration judge's opinion that he could live a full life if he just didn't let folks know that he was gay? It's a drastic mischaracterization of asylum law. The fact that the judge already acknowledges that homosexuality is a particular social group and then goes on to say that he should have to hide that immutable characteristic is what asylum is for. So that is by far the easiest error that we can point to in the record that the judge has made. And on that alone, the court should be able to reverse and find asylum for Mr. Sinaloa. Is the only threat that he faces the threat from his father, or are there other people looking for him? Your Honor, that leads into my argument for future persecution, which is a totality of the circumstances the fact that the government of Ghana has criminalized homosexuality, has actually targeted male homosexuality with these laws, and the judge and the government mischaracterizes this as a mere misdemeanor. However, it is not a misdemeanor in the way that we would think of like a fine or maybe even a short jail sentence. He could be in prison for up to three years. And there's no way for him to report any violence that he would suffer, because in order to do that, he has to go to the police and acknowledge that he was beaten because he was a homosexual, which would put him in the position of potentially being arrested. There is nowhere in Ghana that he can go where he is not likely to face some form of persecution. The country report further bears this out when they talk about how the laws do not prohibit discrimination based on sexual orientation or gender identification. Then the country report also talks about human rights problems in the LGBTI community where they are attacked based on political motivation and vigilante violence. There's widespread discrimination in employment and education. The police harass and extort homosexuals. The police are reluctant to investigate claims of assault or violence. And imprisoned gay men are often victims of physical and sexual assault. This all leads to the fact that homosexuals feel intimidated and that the attitude of the police would not lead them to any successful protection. This is all also bared out by the Amnesty International report and other NGOs where they say that homosexuality continues to be a crime. The homosexuals in Ghana also face police harassment, discrimination, violence, and blackmail countrywide. Again, there is no place that Mr. Somaila could relocate. In the political discourse, Mr. Ibrahim, one of Somaila's friends, said that the authorities in Ghana have minimal concern for gay rights and politicians are always promising electorates of eradicating gays and their political campaign messages. This is to say that the politicians are actively campaigning for the elimination and the eradication of homosexuals, which meets the burden set forth by the government in the Fatim case where the government says that we have to show that there is a pattern of discrimination against this group. And we can show that by the country reports and the political discourse. This all creates a cultural norm where the father felt that it was okay to take up arms against his son when he discovered he was homosexual. Further, the father was able to call for the community who quickly rallied to the father to execute Mr. Somaila. No one stopped to think about whether this was right or wrong. They had no fear of doing this because of the attitude of the police.  And then this all ends with Mr. Ibrahim, who was Mr. Somaila's savior, even though he allowed Mr. Somaila to stay in his home, he only allowed him to do so very briefly before even he feared for his life in case of retaliation against him for protecting a homosexual. And when he gave his testimony, at the end of it, he asked that we keep the testimony confidential because he feared that even testifying on behalf of Mr. Somaila could lead to his death. So we can see that any objectionable person in Mr. Somaila's situation would fear returning to Ghana and facing persecution for being a homosexual. There is nowhere for Mr. Somaila to relocate in Ghana. Further, if this were a case of any other protected social group, if this was a religion, if this was a political attitude, the court below would have probably had no difficulty seeing that Mr. Somaila had been persecuted because we wouldn't send somebody back to a country where they could be arrested and imprisoned for simply holding their religious beliefs. For the reasons stated, this court should overrule the BIA's decision and grant Mr. Somaila asylum, withholding, and cap protection. Thank you, Your Honors. Judge Roth, any questions? Thank you. Thank you. Good morning, Mr. Roth. Good morning, Your Honors. May it please the Court, Jonathan Roth for the Attorney General. This is a case about a young man who experienced an event that was unfortunate, it was embarrassing, it was physically painful, and it was unjust. However, under the case law of this circuit, it was not persecution. The agency was reasonable where it found that based on Mr. Somaila's testimony, he experienced one single isolated attack that involved no serious harm to his body, perpetrated by a black man. The fact that this attack was instigated by the revelation that he was a homosexual, and now that it's announced that he's a homosexual, isn't he going to be continuously exposed to attacks for just that reason? Yes, Your Honor. That goes to whether or not Mr. Somaila exhibited a well-founded fear of future persecution, and it doesn't have a bearing on his claim of past persecution. But even as my colleague correctly noted, the subjective component of well-founded fear was deemed met. The objective evidence in the record showed that no objective fear existed, based on the country reports and based on the fact that there was no past persecution and therefore no rebuttable presumption of future persecution. But there's no past persecution, consistent with Judge Robb's question, because up until that point, his community didn't know he was gay. So at this point, you can't hide that anymore, and that's what led to the beating. So going forward, it's fair to assume that people will know he is gay, and he could expect further beatings. Again, Your Honor, that characterization is, I don't think, supported by the record. And even the immigration judge made findings as to this specific question, whether or not there was a well-founded fear in the future of persecution. Ultimately, the agency… The same judge that said he could live a life and hide the fact that he was gay. Your Honor, it's an unfortunate comment. However, in terms of the scope of review, this court reviews the board's decision to the extent that it relies on the immigration judge's decision. And by explicitly not adhering to that portion, the government argues that that part of the decision still stands and is supported by the evidence, the record evidence, even without that unfortunate comment. Didn't the BIA and immigration judge misstate the law? No, Your Honor. The immigration judge… Did our law say that you have to have more than one incident? No, Your Honor, and this is a question… But didn't they say that? Didn't they say there was only one incident here? They did say that there was only one incident. Did they misstate the law, then? I respectfully disagree, Your Honor. I stand before you today and say that based on Mr. Sumaila's testimony, he only suffered one attack. And although this court has examined the question repeatedly over the last 15 years and has said that there is an imprecise line between when harm goes from unfortunate to outrageous, it is an imprecise one. However, the harm that befell Mr. Sumaila in this case did not rise to that level. What authority do you have to support that position? Absolutely. So, in Treveria, for instance, that is a case where there was two separate instances of harm that befell the noncitizen in that case. First was an act of surveillance. Second was an act where the person was run off the road, taken by paramilitary troops into their vehicle, and held at gunpoint with an explicit threat that they were going to end that person's life. That case isn't comparable to here where there's only one incident. Well, see, it sounds to me like you're adopting the theory that you need more than one incident in order to show past persecution. That's exactly what my question was. No, Your Honor. I don't think that it's whether or not it's one or two incidents is dispositive. However, the case law of this circuit in Chen and Convinda are cases where there is one incident, and Chen not requiring medical care, and Convinda requiring medical assistance with the form of seven stitches. What about Voce? Even in Voce, that's multiple. Those were multiple. But there's nothing in Voce to say that you need more than one incident, is there? No, there's not. However, that is a case involving seven severe beatings, including someone who had experienced a broken knee. So this case is squarely... If we take your logic and extend it where you want it to go, he'd have to come back and take a second beating or a third beating, and then he's in a position to seek relief? Is that what you're telling us? Not necessarily, Your Honor. And this is where the question, as this Court has highlighted before, the imprecise line that exists between misconduct and persecution, it is a question... Well, where do you say that line should be drawn? Where do you say we have said it should be drawn? I respectfully say that that is for Your Honors to determine. However, this is a case... We understand that, but I'd like to know from you, where do you think we have said that line should be drawn? That line should be drawn where there is truly outrageous conduct. Why isn't this conduct, which the IJA believed took place, why doesn't that constitute outrageous conduct? It doesn't constitute outrageous conduct in this case because not only were the injuries non-severe, Mr. Sumaili himself... So it's not outrageous that the individual's father and his cohort want to decapitate the individual or burn him to death. That's not outrageous? That's what happened here, right? Your Honor... That's what happened, you'd agree. On the record we have here, that's what happened. Not exactly. I would like to correct the record in as much as my colleague suggested that this was an imminent threat. The attack, which the immigration judge considered in its totality, consisted of a physical assault and intimidation. That intimidation included, we should perhaps take this individual to the police. Perhaps we should do other things to him. Like burn him or cut his head off. That is correct, but also we should take him to the police. Those are intimidation tactics. What's the record indicate the meaning was of the threat of taking him to the police? I'm sorry, Your Honor. What was that about? Does that help your argument or does that hurt your argument? As much as that it's a non-death threat that is included among the other threats, even police action, even arbitrary arrest, this court has found not to be harm rising to the level of persecution. Especially considering, and I want to circle back here, to the harm that actually befell Mr. Sumaila. He was able to immediately escape the people that were pursuing him. He was able to escape them by running ten minutes. And then once he got to his friend's home where he remained for two days, he never sought medical treatment. When the immigration judge explicitly asked, did you require... I have a question. Yes, Your Honor. He said he didn't seek medical treatment because he was afraid to do so. Now, that doesn't mean he simply didn't see the need for medical treatment. He feared for his well-being if he sought medical treatment. And I think that is an equally distinguishable situation. Potentially, Your Honor. However, the record doesn't contain that information. The explicit question, and I can read from it if Your Honors would like, but the explicit... The record contains the information that the petitioner himself, stated that he was afraid to seek medical attention. Now, there is nothing else on that subject in the record. So are we not, since this man was not found to be incredible, don't we have to accept that? Mr. Sumaila explicitly testified that when this incident... This is ARH 120. When this incident happened, I was so afraid... The immigration judge asked, excuse me, DHS counsel asked, did you get any medical treatment, sir? Mr. Sumaila, when this incident happened, I was so afraid. I was so afraid I couldn't even go to a hospital. I was just afraid. Two points. Number one, this does not, based on the testimony alone, this does not infer that he did not need medical care. This is that he did not seek medical care, which, with his burden to prove, to me suggests, to the government, suggests that the harm that befell him was not severe. But even more importantly... Right? I mean, that's the immigration, that was the testimony that he was found credible. Your Honor... So the fact that he was able to save himself is now going to come back to hurt him? No, Your Honor. And the government doesn't take that position. However, in terms of evaluating... You're saying exactly that. You're saying that there was no physical injury to the guy, so there was really no persecution. The government's position is, as the agency reasonably found, that having injuries to your head and to your mouth and to your back does not rise to the level of persecution, especially when you never needed medical treatment. Even if we accept the premise that Mr. Somaila did not need medical treatment or could not access medical treatment because he was too afraid, that doesn't explain why he spent two weeks in Togo, why he didn't seek medical treatment there. Or when he made the trip to Ecuador, that he didn't seek medical treatment there. Or that he didn't seek medical treatment in the entire trip from South America to the United States border or upon reaching salvation in this country. The fact that he does not have any type of severe beating, severe injuries stemming from one single incident, based on the case law of this circuit, makes it akin to Chen and to Kim. Even if we accepted your argument on that, that merely is an argument on past persecution. Yes, Your Honor. Okay. Let's assume you're correct. Let's look at the future persecution. Let's just look at the fear of persecution going forward. Isn't the record replete with incidents that indicate that not only would Mr. Somaila be in danger, but that others similarly situated to him would be in danger in Ghana? Your Honor, this is all evidence that the immigration judge explicitly considered. The immigration judge, as affirmed by the Board of Immigration Appeals, found that the country reports contained evidence of widespread discrimination and harassment. However, discrimination and harassment are not types of conduct that this court has found to be outrageous. And moreover, any types of government action that we see in the country report does not involve any physical harm or violence perpetrated by the police or other actors. In fact, the record also contains evidence of police in Ghana, excuse me, prosecutors in Ghana bringing cases against people who commit atrocities. The record also indicates that police in Ghana bring charges against people like Mr. Somaila. Yes, Your Honor. That's absolutely correct. However, those charges, it's purely speculative whether or not this would, the same, that that experience would befall Mr. Somaila. Well, that might be the best thing that could happen to him. If the other threats are beheading or burning. Yes, Your Honor, but as my colleague said before, the immigration judge in this case did not reach an unable or unwilling determination. And it was not required to do so where there was no past persecution. Okay, so where does that put this case? If we agree with you on past persecution, where does that put this case? What should we do with it if we don't agree with you on a fear of persecution? What should we do with it? Your Honor, the objective component of this case, based on the country reports and based on the immigration judge's reasoning, is one reasonable way of deciding this case. However, if this court finds that the immigration judge was acting completely unreasonably, if reasonable minds could differ, then this case cannot, this court cannot, cannot, it does not compel reversal of the agency's decision. However, if this court were to find that the well-founded fear portion of the case was insufficient, the case would need to be remanded for those purposes. And that's another point, too, that I'd like to correct the record. Again, I want to commend, really, the job that my colleagues did. However, this court cannot grant asylum or withholding of removal or a CAT in this case. There's just insufficient findings in the record for the court to be able to act that way. If the court were to find in favor of Mr. Samayla, the appropriate course would be to remand to the Board of Immigration Appeals. As I said before, that even if reasonable minds can differ as to whether this harm constituted past persecution, that does not compel reversal in this case. It is an extremely deferential standard, and the immigration judge fully considered not only the physical attack that befell Mr. Samayla, but also the intimidation. This is found at page 59, 60, and 62 of the administrative record. He fully considered this evidence in concluding that it didn't rise to the level of outrageous conduct, like the court has previously seen in Bocey and Tarapia. You wrote, or actually Mr. Yeah, you wrote. Yes, Your Honor. On the 26th and brought to our attention the matter of A.B. Brown. Or of A.B., matter of A.B. Yes, Your Honor. If we remanded this case, what would the implication of matter of A.B. have here? What would be the implication? The reason that I wrote to this court to begin with was just out of an abundance of caution. We appreciate that. Yes. The government does not believe that matter of A.B. applies to this case. However, upon remand, matter of A.B. would in all likelihood not help Mr. Samayla's case, especially in terms of its findings on family. It wouldn't help that case perhaps, but is it something that the government, is it your position that it's a case, it's an authority that the government could cite? Yes, Your Honor. Okay. However, that case focuses in relevant part on whether or not private parties, specifically family members, can be at the root cause of persecution. In this case where Mr. Samayla claims persecution from his family members, matter of A.B. would not support that case. But isn't that persecution, in fact, not just from family members, but from the whole community? From private actors, that's correct, Your Honor. It supports the proposition that, in fact, it deepens the fact that private actors, in the vast majority of cases, cannot persecute people, but for a very discreet situation. Your Honor, if I may finish briefly. Sure. Here the agency applied the correct legal standards, didn't miscategorize any of the evidence. There was no evidence ignored, and the immigration judge, as affirmed by the board, was reasonable in concluding that, based on the case law of this circuit, the one instance of harm and the intimidation that came with it did not rise to the level of persecution. And the court should deny this case. Thank you. Thank you. Your Honors, the government discusses past harm in a single incident an awful lot. However, as Your Honors have properly pointed out, the alternative to Mr. Samayla suffering more than one incident would have been to return to a similar situation and perhaps actually be killed. This court can't reasonably expect someone who has suffered such a severe threat to their life, where substantial steps were taken to actually end his life, to return to a situation in order to get attacked, what, a second time in order to justify more than one incident? This court's never held that we need one incident. This court has held that a threat to life is sufficient enough to beat past persecution, and we have that here. The IJ further found the testimony credible, meaning that we know that Mr. Samayla faced this threat to his life. And then the government proposed the alternative, well, they could have arrested him, but that's not arbitrary. That is, in fact, specifically targeted against homosexual males. It's not an arbitrary arrest, and it still meets the definition that the government has set forward. And the government also misstates the country report says there are cases against people who have physically abused homosexuals. There was one listed in the country report, and even then there's no proof that it ever moved forward. Now, he does bring up a point about remand. This court, if it remands this case, should remand it to be judged consistent with your opinion, as the Ninth Circuit did in the case of Abbas that we submitted in our reply to the 28J. The court can also find Mr. Samayla statutorily eligible for asylum, and this court should definitely find that with all the government conditions that Mr. Samayla is CAT eligible, which is not a decision that the BIA would then be able to argue with this court. Thank you. Thank you. Can you really go so far as to say he's not CAT eligible? I'm sorry, ma'am? Can you really go so far as to say that he is not CAT eligible? I think that he is CAT eligible. There is sufficient evidence that politicians are involved in a campaign to eradicate homosexuals in Ghana. He's an outed homosexual. He is definitely going to face persecution upon his return, and imprisonment is a form of torture by taking away his liberty. And there's evidence in the record in the state report of vigilante mobs that the government is unable and unwilling to control. Thank you very much. Thank you, Your Honor. Thanks again to the clinic for taking this case pro bono. Thank you, Your Honor. Thank you.